ST. PAUL TRUST & SAVINGS BANK et al. v. AMERICAN CLEARING CO.
et al.

(District Court, S. D. Florida. June 15, 1923.)

1. **Equity ☞363—Facts taken as true on motion to dismiss.**

Where cause is submitted on defendant's motion to dismiss a bill for want of equity, the facts alleged in the bill must be taken as true.

2. **Taxation ☞22—Taxation used only in aid of a "public object."**

The power of taxation can only be used in aid of a public object, that is, an object which is within the purpose for which governments ·are established, and such power cannot be exercised in aid of enterprises strictly private, for the benefit of individuals. though in some remote or incidental collateral way the local public may be benefited thereby.

3. **Constitutional law ☞68(4)—Courts may determine whether tax act is for public object.**

Courts have the right to pass upon whether the purpose of an act authorizing a tax is a public one.

4. **Taxation ☞2—Taxation requires consent of governed through Legislature, and individual consent unnecessary.**

Taxation, while theoretically requiring the consent of the governed, requires that consent through its duly accredited representatives in the legislative departments only, and not the individual consent of each and every property owner to each and every particular item of taxation.

5. **Evidence ☞13—Common knowledge that pine stumps valuable for several purposes.**

It is common knowledge that pine stumps on cut-over pine lands are valuable for several purposes.

6. **Eminent domain ☞1—Owner of realty cannot prevent use for public purpose.**

The interest of the public in lands upon which public improvements are to be made can be taken against the will of the owner by proceedings in eminent domain. and the owner cannot prevent the use thereof, and the public is not dependent on securing his consent to such use.

7. **Taxation ☞24—Statute creating land clearing district permits taxation for "private purpose."**

Acts Fla. 1919, c. 8008, providing for the organization of a land clearing district, is invalid as authorizing a tax for a "private purpose," in view of Const. Fla. art. 9, § 7.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Private· Purpose.]

8. **Taxation ☞24—Assuming act justified incorporation of land clearing district and decree thereof for advantage of owners, held that it is invalid because such advantage did not authorize levy of tax provided for.**

Assuming Acts Fla. 1919, c. 8008, justifies incorporation of land clearing districts in the disjunctive as public or private corporations, and a decree of incorporation merely finding that the incorporation would be for the advantage of the owners of the real property, it is invalid, for the advantage of the owner is in no sense sufficient to authorize the levy of a tax on the land for the improvement as provided therein.

9. **Constitutional law ☞137, 284(2)—Land Clearing Act held to take property without due process and to impair obligation of contract.**

Acts Fla. 1919, c. 8008, providing for organization of land clearing district, is invalid as permitting the taking of property without due process of law and impairing obligation of contracts. in that it· does not require notice to mortgagee of land and makes tax levied by the district a prior lien over pre-existing mortgages.

---

10. Constitutional law ⊙⇒43(1)—Mortgagee not guilty of laches or estopped to bring suit to have statute declared invalid.

Mortgagee of land was not guilty of laches or estopped from bringing suit to have declared invalid and void a statute permitting a land clearing district and bonds issued by the district, the statute being a nullity ab initio.

In Equity. Bill by the St. Paul Trust & Savings Bank, formerly the Van Sant Trust Company, as trustee, and another, against the American Clearing Company and others. On motion to dismiss bill. Motion overruled.

See, also, St. Paul Trust & Savings Bank v. Walkill Stock Farms Co., 280 Fed. 403.

Giles J. Patterson, of Jacksonville, Fla., for plaintiffs.

Cooper, Cooper & Osborne, of Jacksonville, Fla., and Harmon, Colston, Goldsmith & Hoadly, of Cincinnati, Ohio, for defendants.

CLAYTON, District Judge. The plaintiff the St. Paul Trust & Savings Bank, formerly the Van Sant Trust Company, as trustee, and Grant Van Sant as individual trustee, bring this bill on behalf of themselves as trustees and on behalf of the holders of the bonds secured by the deed of trust or mortgage on the property described in the bill, against the American Clearing Company, a corporation, Citizens' Savings Bank & Trust Company of Hamilton, Ohio, a corporation, the First National Bank of Hamilton, Ohio, a corporation, the Citizens' National Bank of Lebanon, Ohio, a corporation, George N. Davis as receiver of the American Clearing Company, A. J. Murrhee as tax collector of Clay county, Fla., R. L. Dollings and H. J. Wagener, citizens of Hamilton, Ohio, and M. E. Lamberton, a citizen of Green Cove Springs, Fla., individually and as constituting the board of supervisors of the Walkill stump and land clearing district, and G. F. Osler, a citizen of Cincinnati, Ohio.

[1] The cause is submitted upon the defendants' motion to dismiss the bill for want of equity; therefore, the alleged facts of the bill must be taken as true. See Footnotes, Rule 29, Hopkins' New Fed. Eq. Rules (3d Ed.).

The bill is necessarily long and contains an attack by the plaintiff as trustee upon the validity of certain bonds issued by the defendant Walkill Stump & Land Clearing District and upon the levy of taxes for the payment of the same, on the lands covered by the plaintiff's mortgage; and prays for injunction restraining the collection of such taxes; that the bonds of the clearing district be declared invalid; and for a decree holding void the act under which the district was incorporated.

The allegations of the bill, material in the consideration of the motion, may be summarized so far as practicable as follows:

That the plaintiff during the months of December, 1918, and January, 1919, carried on certain negotiations with Dollings individually and as president of the Walkill Stock Farms Company, looking to the making of a loan upon the properties of the company to be secured

⊙⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

by a mortgage or deed of trust, and that as a material inducement to the making of such loan it was understood and agreed that the company would continue to clear its lands for the purpose of cultivation at the rate of 500 acres per year, and that as a result of said negotiations a mortgage or deed of trust was executed to the plaintiff by the Walkill Stock Farms Company on the 18th day of February, 1919, covering the lands of the company, which mortgage was duly recorded in accordance with law, and at the same time there were executed and delivered 370 bonds aggregating the total face value of $175,000, secured by the terms of the mortgage or deed of trust; that it was the purpose of the plaintiff and its understanding that said mortgage constituted a first lien upon the property described prior to all other liens except liens for state and county taxes, and that the plaintiff paid over to the Walkill Stock Farms Company the money upon such bonds as had been theretofore agreed; that it was a material consideration to the making of the loan that the expense of clearing the land would be borne by the company for the purpose of improving the security for the loan; that at the time of the making of the loan the defendant Dollings was president and the defendant Wagener was secretary of the Walkill Stock Farms Company, and the defendant Dollings owned 1,960 shares of the common stock, being all except 40 shares of the common stock which had the exclusive voting power at that time, and that the other 40 shares of the common stock were held by the defendant Wagener 10, Dollings' wife 10, and 20 shares by other parties; that at or about the time of the execution of the mortgage said Dollings and his associates had in their control the right to manufacture and use certain stump pullers which it was understood would be used in the clearing of the lands.

Further, that after the loan had been closed the defendant Dollings and his associates procured the passage by the Legislature of the State of Florida at the session of 1919 of a Special Act entitled Chapter 8008, approved June 9, 1919, and that the procurement of such act was for the purpose of enabling the defendant Dollings and his associates to create a prior lien upon the properties described in the bill to the lien of the plaintiff herein, in order to pay for the stumping and clearing of the lands, and that acting under the terms of this act Dollings and his associates organized a corporation under the laws of Delaware known as the American Clearing Company, the preferred stock of which was sold to the extent of $750,000, and such company was organized for the purpose of clearing and stumping lands and for the purpose of utilizing the stump pullers above referred to; and that Dollings transferred to the American Clearing Company the common stock of the Walkill Stock Farms Company which he then held; that under the terms of the act defendants Dollings, Osler, and Wagener instituted proceedings in the circuit court of Clay county, Fla., by filing a petition seeking the incorporation of the Walkill stump and land clearing district. and that all the lands in the proposed district were the property of the Walkill Stock Farms Company and included within the terms of the mortgage to the plaintiff, though deeds had been executed to defendants Wagener and Osler and to the de-

fendant Lamberton, who was a stenographer in the office, for the purpose of qualifying them as landowners.

Again, that on December 16, 1919, the judge of the circuit court of Clay county, Fla., entered a decree incorporating the properties described in the petition into the Walkill Stump & Land Clearing District which was declared to be a public corporation to exist for a period of 35 years, but in the decree the court did not find that the same would be for the public benefit, convenience, or welfare, a copy of the decree being attached to the bill; that notices were then published in accordance with the act by the clerk of the circuit court, addressed to the individual defendants and the Walkill Stock Farms Company, calling a meeting for the election of a board of supervisors, and the defendants Wagener, Dollings, and Osler were chosen manager, president, and secretary, respectively, and members of such board, being at the same time secretary, president, and attorney of the Walkill Stock Farms Company; that on January 24, 1920, a "plan of stumping and clearing" was filed in the office of the clerk of the circuit court of Clay county by Wagener as district manager and certified to as having been adopted by the board, which plan specifically recommended the clearing of the lands by contract, and a petition was also filed praying for the appointment of commissioners for the purpose of assessing the benefits and damages resulting to the property in the district; and that such commissioners were appointed by order of the court January 29, 1920; and on February 5, their report was filed, estimating the total benefits to accrue to the 8,516 acres of land equal to the sum of $510,960, and estimating the cost of clearing such lands in accordance with the report of the manager at $324,480, or at the rate of $38 per acre; and this report was subsequently confirmed by decree of the circuit court March 17, 1920; that the defendants Dollings, Wagener, and Osler continued to serve as the supervisors of the district and as officers and agents of the Walkill Stock Farms Company and of the American Clearing Company during all the times mentioned in the bill.

The bill then alleges that these individual defendants as supervisors authorized the issue of $300,000 of bonds for the purpose of paying for the clearing of the lands and then made a contract for such clearing with themselves as officers of the American Clearing Company. The terms of the contract were not stated in the bill, but discovery of the same is sought, and it is charged that the contract was exhorbitant and unreasonable; that the American Clearing Company agreed to accept such bonds in payment for the clearing work and did engage in such clearing, but only about 2,500 acres of the lands were cleared; that notwithstanding this fact the said Dollings, Osler, and Wagener issued and delivered to themselves in some capacity all of the bonds of the district, a large portion of the bonds being conveyed to them shortly before the filing of the bill under the guise of an illegal contract for the purchase of machinery and equipment owned by the American Clearing Company by the district; and the bill alleges that such purchase and sale was not in good faith, but was for the purpose of enabling them to realize money from the bonds; that

the bonds were thereafter pledged or conveyed to various defendants named in the bill and other persons unknown to the plaintiff.

Furthermore, that in 1921 Dollings, Wagener, and Osler, presuming to act as members of the board of supervisors, attempted to spread a tax levy for the year 1921, same being presumably an installment of what was under the act to be a total tax, but no certificate of the total tax or list of the same was ever filed in the office of the clerk of the circuit court as required by section 17 of chapter 8008, nor was any certificate evidencing the lien of the same filed as required by section 22 of chapter 8008; and that said taxes for the year 1921 are shown by a tax book in the hands of the tax collector of Clay county, and the same are unpaid.

The bill then declares that the defendants Walkill Stock Farms Company and Dollings failed to pay the coupons which were due upon the bonds in February and August, 1921, and that foreclosure proceedings have been instituted by the plaintiff, which are now pending in this court and have been consolidated with other proceedings brought by the American Clearing Company against Walkill Stock Farms Company, in which proceedings receivers were appointed in the District Court of the United States for the Western Division of the Southern District of Ohio, on March 25, 1922, the receivers being one Mackoy and the defendant Osler; that the procurement of the judgment by the American Clearing Company against Walkill Stock Farms Company, upon which the bill for receiver was based, was taken by consent, suit having been instituted the same day that judgment was obtained, to wit, March 25, 1922, and the receivers were appointed the same day; that subsequently one R. L. Blagg, who had formerly been associated with Dollings, was appointed ancillary receiver of the Walkill Stock Farms Company by the judge of this court.

The bill also states that none of the receivers have any funds with which to pay the installment of taxes above set out, and that practically all of the personal property of the company has been sold or is gone, and that the real estate owned by the company is about the only asset of any value in their hands. An amendment to the bill, filed by leave of court, alleges further that the entire properties of the company are assessed at only $49,000, and that the lien of the bonds is more than $300,000, and that the same would be confiscatory of such property in that the tax levy would be in excess of one half million dollars against the 8,516 acres of land. The amendment further alleges that the value of the real estate covered by the mortgage of the plaintiff is not sufficient to equal the amount of the tax lien levied or attempted to be levied and the lien of the plaintiff herein. The bill also alleges the appointment of a receiver in the state of Delaware by the federal court for the American Clearing Company, and that such proceedings show that the American Clearing Company is heavily involved.

Specifically the act, chapter 8008, Laws of Florida 1919, is attacked on the ground that it is in conflict with the Fourteenth Amendment of the Constitution of the United States, in that it attempts to deprive

the plaintiff of its rights and property without due process of law, and to deny to the plaintiff equal protection of the law; further, on the ground that the act is also hostile to the Fifth Amendment of the Constitution of the United States, in that it attempts to deprive the plaintiff of its property and rights without due process of law, in that said act does not provide for any notice to be given to the plaintiff herein of the proceedings for the incorporation of said district, and that no notice is given to the plaintiff of such proceedings. Again, said act is assailed upon the ground that it is in conflict with section 10, art. 1, of the Constitution of the United States, in that it impairs the obligation of the contract, that is the mortgage hereinbefore described, made by the defendants to the plaintiff as trustee, wherein it is agreed by defendants, mortgagors, and plaintiff that nothing should be done to depreciate or impair the value of the security afforded by the mortgage to plaintiff; and the further reason is urged that the act of the Legislature, chapter 8008, supra, and the proceedings thereunder, purported to authorize and to create a prior lien upon the properties covered by the mortgage to the plaintiff, which is claimed to be a first lien, which it is alleged could not be impaired by the statute; and, further, that the statute is not a proper exercise of the power of taxation nor for a public purpose. The act is also challenged as being repugnant to section 12 of the Declaration of Rights of the Constitution of the state of Florida, in that it is an attempt to take the property of the plaintiff without due process of law and also without just compensation; further, that the act is in contravention of section 17 of the Declaration of Rights of the Constitution of Florida, in that it attempts to impair the obligation of the contract made and entered into between the plaintiff and the Walkill Stock Farms Company and defendant Dollings for a first lien on said property, for that said act attempted to authorize the imposition of a prior lien without the consent of the plaintiff and impairs the security of its lien as mortgagee. And again the act is said to be void in that it attempts to create a corporation with municipal powers, with the right to levy taxes, whereas, it is charged that it is apparent that the purpose for which said corporation was organized was not a public one and that in its passage the Legislature exceeded its constitutional authority in its effort to confer the power of taxation upon the Walkill Stump & Land Clearing District; and also that because the said Walkill Stump & Land Clearing District has been unlawfully charged to perform functions which are private and individual in their nature; and that it was not in the power of the Legislature to create a lien superior to the lien of the plaintiff. Further reasons are given for questioning the validity of the Florida act, but it is not necessary to here state them.

The validity of the Florida act is to be construed primarily, although incidentally there are other questions involved. The case turns upon whether or not the Florida act is in conflict with plaintiff's rights claimed to be guaranteed by the Constitutions of the United States and Florida. Does the act deprive the plaintiff of its property without due process of law? Does it impair the obligation of the plaintiff's contract? The same questions are raised under sections 12 and

17 of the Declaration of Rights of the Florida Constitution which are practically identical with the provisions of the federal Constitution referred to. And the further insistence is that the act was beyond the power of the Legislature and contrary to sound public policy. All of these attacks may be reduced to the question: Is the act for a public purpose for which a corporation may be created and have granted to it the governmental power of taxation?

[2] Always the fundamental principle has been recognized that the power of taxation can only be used in aid of a public object, that is an object which is within the purpose for which governments are established; and such power cannot be exercised in aid of enterprises strictly private, for the benefit of individuals, though in some remote or incidental collateral way the local public may be benefited thereby. Loan Association v. Topeka, 20 Wall. 655, 22 L. Ed. 455. In that case it is said to be the duty of the Legislature which imposes or authorizes a municipal tax to see to it that the tax is not used for private interests instead of public use; and that whether in a given case the object for which taxes are assessed falls upon the one side or the other of this line must be determined mainly by the course and the usage of government, the objects for which taxes have been customarily and by long course of legislation levied, and what objects or purposes have been considered necessary for the support and for the proper use of government, whether state or municipal. It is also said that whatever lawfully pertains to this, sanctioned by time and acquiescence of the people, may be held to belong to the public use and proper for the maintenance of good government, though this might not be the only criterion of rightful taxation. Mr. Justice Miller in the opinion cites and comments with approval on Lowell v. City of Boston, post; Curtis v. Whipple, 24 Wis. 350, 1 Am. Rep. 187; Whiting v. Fond du Lac R. Co., 25 Wis. 188, 3 Am. Rep. 30.

It is said in Burroughs on Taxation, p. 19:

In cases of roads, railroads, canals, schools, bounties, and drainage for health, the benefit derived is direct to all the people of the state. The construction of these works, or the doing of these acts, is a duty of the state to all the people of the state. The purpose, the object, is governmental, although incidentally individuals may be benefited. In the cases declared to be for a private purpose, the object of the act was the benefit of individuals, although incidentally the public was benefited.

In Lowell v. Boston, 111 Mass. 454, 15 Am. Rep. 39, Feldman v. City Council, 23 S. C. 63, 55 Am. Rep. 6, and Mich. Sugar Co. v. Dix, 124 Mich. 674, 83 N. W. 625, 56 L. R. A. 329, 83 Am. St. Rep. 354, the statutes were declared unconstitutional as not being for a public purpose, although there was incidentally a public benefit.

In Deal v. Mississippi County, 107 Mo. 464, 18 S. W. 24, 14 L. R. A. 622, the court held unconstitutional an act of the Legislature which provided that persons who planted one acre or more of prairie land with any kind of forest trees and cultivated the same for three years should be entitled to receive $2 per acre bounty for growing such trees. Provisions were made for the filing of certain documents with the clerk of the court showing the location of the trees, etc. The

question at issue as stated by the court was whether this statute was a grant of public money to individuals or corporations, and whether it was a use of tax money for a purpose other than a public one, which was prohibited by the Constitution. The court said:

It is not always easy to determine what a public purpose is, but here no difficulty arises. * * * That an enterprise may indirectly inure to the public benefit is not the sole criterion by which to determine a public purpose. Every improvement and every business enterprise benefits the public to some extent.

The court then quoted at length from the Topeka Case, supra, and also from the case of McCullough v. Maryland, 4 Wheat. 316, 4 L. Ed. 579, and concluded with the following quotation from Sharpless v. Mayor, 21 Pa. 168, 59 Am. Dec. 759:

The Legislature has no constitutional right to levy a tax, or to authorize any municipal corporation to do it, in order to raise funds for private purposes. No such authority passed to the assembly by any grant of legislative power. This would not be legislative. Taxation is a mode of raising revenue for public purposes. When it is prostituted to objects in no way connected with the public interest or welfare, it ceases to be taxation, and becomes plunder.

The Missouri court is further quoted:

The principle announced by these authorities is not founded on or deduced from positive, affirmative, constitutional provisions, but on and from the limitation of the taxing power itself. Our Constitution, therefore, on this subject is simply declaratory of the common law, and of general principles well recognized and almost of universal application. The Legislature of Missouri had no power to authorize county courts to raise money by taxation, to be appropriated to the planting of trees upon private property for private gain, no right to the trees or the use or control of the trees being reserved to the public.

The application of this case is particularly pertinent.

[3] The purpose for which the statutes state that the districts are to be incorporated is: Clearing or stumping land or lands not now fitted for agricultural purposes for sanitary or agricultural purposes or when the same may be conducive to the public health, convenience, or welfare, or of public utility or benefit by clearing, or stumping, or otherwise. That the courts have the right to pass upon the question of whether the purpose of the act is a public one cannot be denied. The Supreme Court of Florida, in the case of Hunter v. Owens, 80 Fla. 812, 86 South. 839, has held that even where the act by express wording states that the incorporation of such district is a public necessity, the courts can then find to the contrary if it appears from an examination of the act that such statement is purely superficial and that the real purpose is otherwise. We have no declaration of such fact in this act, and consequently it is not necessary to consider the question, but Page & Jones, in paragraph 291, contains a multitude of citations to the effect that the determination of whether the improvement is a proper one for the levying of assessments is subject to review by the courts. The act has apparently delegated to the court the duty of determining whether such incorporation would be for a

public purpose or not; but such delegation and authority, as it will be shown, is merely superficial and not really in pursuance of a public purpose.

It seems that there is no precedent for the kind of district here involved; and, consequently, this court is unhampered and unaided in its decision by any opinions of other courts except as the same may be applicable by analogy in the consideration of the questions of constitutional law involved.

We find by reference to authorities on special assessments that the power to levy taxes has been extended by the Legislature and the courts of our country, particularly to levy special assessment taxes for drainage, irrigation, sewers, street paving, sidewalks, electric lights, water front improvements, road districts, inlet districts, and possibly the most extreme case, fencing districts, on the ground that these various purposes were public and justified the levy of a tax. But, in all of these various forms of special assessment districts, we find, in addition to the general statement that the purposes were public, certain distinguishing outstanding characteristics which mark the limit beyond which the state cannot go in the levy of taxes.

It is first held by the early authorities, and in fact is still held by a number of states, that drainage was not a public purpose except where it directly involved questions of public health. This has since been extended, it is true, so as to authorize the incorporation of drainage districts in states where there are large bodies of swamp and overflow lands incapable of development or cultivation otherwise. Other courts have followed this same general reasoning in sustaining the validity of irrigation districts, but these are illustrations of the furtherest limit to which the imposition of special assessment taxes has been extended. The reason of them I shall point out later on. Some of the points which mark the limits of this power are: (1) Where it is impossible to carry out the project in so far as is necessary for one individual property owner without the adjacent property owners necessarily receiving the benefit, as, for instance, a man draining his own land and being compelled to drain a pond on his neighbor's land in order to drain his own. (2) Where it is impossible for one property owner to improve his property and render it susceptible of cultivation and use except by having the right and power to go across invitum the property of his neighbor, as, for instance, the necessity for bringing irrigation water from a river across the intervening property owners' land in order to irrigate his own, or to cut a ditch into his neighbor's land in order to get the water off his own. (3) Where the body of lands involved is so large that individual initiative and enterprise would never be sufficient to bring them into use and cultivation and the state's power of taxation and a portion of its credit are necessary to construct the same—as an extreme case, the Florida Everglades Drainage District. (4) Where a public benefit is direct and immediate, such as a public road, street improvement, sewer, etc.

I think an analysis of the various purposes for which districts have been incorporated with the power of special assessment will disclose that in all of them these characteristics are found in greater or lesser

degree. Even the fencing district is justified in two states where there is no stock law, because of the fact that when a man fences his own land he necessarily fences one side of his neighbor's, and where two or three owners wish to fence their entire holdings against the outside land, they are compelled to include in that fence those who are within the outside boundaries. It is too apparent for argument that irrigation and drainage cannot successfully be carried on except with the public assistance for the reasons given, namely, it is impossible to drain the average land without adjacent land receiving benefit, and it is even more impossible to properly drain or irrigate land without having the right to go across or utilize some portion of the adjacent lands without requiring the consent of the adjacent landowners. The Florida courts have recognized the necessity of this by providing in section 28, art. 16, of the Florida Constitution, that the Legislature shall have the power to provide for the drainage of the land of one person over and through that of another.

Again, (5), another distinguishing fact is that these so-called special assessment districts referred to in the considered cases are denominated improvement districts and have to do with what are known as "public improvements." Not only are they public in a sense that the public is generally benefited by them in the actual construction, but the public is benefited by the use of the improvement itself and there exists a permanent improvement which becomes the property of the improvement district and remains an asset of it, the use of which is controlled by the officials of the district, as, for instance, the right to tap the irrigation ditches and utilize the water which is available; the right to drain into the main ditches and canals which remain open as an outlet; the right to utilize the fence which remains in condition and as a protection against the marauding stock; the right to regulate the use of the pavement, street, or sidewalk as the case may be; in all of these there is a thing which remains in existence. Further, (6), in every improvement district examined, there exists power of condemnation or eminent domain. In fact, it is an essential part of the district's life, and without it the cost of the undertaking would be so greatly enhanced by the knowledge of the property owners that the right of way had to be acquired in order to make the construction work possible, that it would defeat the very purpose for which the district was created.

Another factor of minor importance justifying the creation of these districts is the fact that by doing the work in a large way and by the co-operation of all parties, the cost to any one of them is necessarily reduced. There are other minor characteristics.

Applying these distinguishing features, therefore, to the act in question, we find first of all: (1) No advantage that one property owner could receive from the fact that his neighbor's lands had been stumped and cleared, unless it be found in an imaginary enhancement in value by reason of being in a more settled community. (2) I can see no reason why one man could not stump his lands and clear them whether his neighbors did so or not, and cannot conceive of any situation arising whereby an individual could not carry on his own clearing

without forcing his neighbors to resort to the same improvement even against their will. To say that clearing could not be conducted except by co-operation of all parties, because of the large tracts of land involved, would be to border on absurdity. Stumping and clearing has always been done by individual initiative. In fact, it could probably be easily demonstrated that in so far as a small landowner is concerned, his own utilization of his spare time for the purpose of clearing his land would be far cheaper than to hire the work done by other means even though it be mechanical. It is almost useless to point out the fact that when the district would have completed its work in a stump clearing district, it would have absolutely nothing to show for it in the way of an asset unless perchance it had invested in some mechanical means of pulling stumps. There would be no ditches to bring in water or to take off water; there would be no streets or pavements; there would be no fences; there would be nothing to show for its work, unless perchance a few holes in the ground where a few stumps had been pulled from. Consequently, how could it be said to be a public improvement? From the standpoint of some landowners who did not want their stumps pulled and their lands cleared, it might possibly be said to be a detriment.

As to the question of eminent domain, there is absence of any provision for such. Such being absent, how could the district effectively operate? There is no method by which it could carry out its plan of stumping, and the property owners could prevent it absolutely by merely refusing to allow entrance upon their lands for the purpose of pulling the stumps or clearing the land. It is doubted whether any practical method could be found for granting the power of eminent domain, or the right of ingress and egress upon another person's land in order to make effective the purposes for which the act is contemplated. Certainly there are no precedents whereby an unlimited right to go at will upon the lands of another person, though it be for the purpose of pulling particular stumps which might be definitely located according to a map and a path outlined for reaching each particular one, much less a general privilege for clearing purposes, is granted.

Moreover, the right of eminent domain contemplates the creation of a permanent easement or privilege. Certainly it would be completely ruinous to the landowner to create a permanent easement to and from the location of each stump upon his land, and, as stated, I know of no precedent for the creation of a temporary right of ingress or egress except by individual consent. In fact, the stumping and clearing of land is and has always been regarded as a private purpose, and there is no precedent in any court or Legislature to the contrary. The history of the United States from the earliest colonial days is in part a history of stumping and clearing by individual initiative, and the development of the country within the comparatively short period of 300 years from wilderness to the greatest is an answer to arguments that it is necessary to resort to forced taxation and involuntary methods in order to carry on further clearing and stumping. It may be a little short of a reflection upon the ability and

initiative of the men who have made the state of Florida great and an aspersion upon the settled communities and agricultural development which exists there. It is true that there are large tracts of land in the state which need clearing and stumping before they can be made susceptible of cultivation, but it may be observed that there is no assurance that such lands would be turned to agricultural use even if stumped and cleared any faster than such stumping and clearly is progressing at the present time.

Counsel at the hearing seemed to lay some stress upon the provisions contained in the act requiring the consent of the landowners before certain things could be done. The very fact that section 3 of the act prohibits the incorporation of the district without the written approval or consent of every owner of every acre of land, and that section 8 prohibits the surveying or estimating of the cost of clearing of any lands after they are included in the district without the written consent of the owner, demonstrates the fact that the author of the act realized that this was a private purpose, and also an acknowledgment that the act to be effective, depends, for validation, upon individual consent. If the district is to be maintained by taxation, the consent of the person taxed in no respect enhances the validity of the act any more than the failure of the property owner to give his consent would prevent the act from being effective ordinarily. While it is generally true that most improvement districts require the consent of a majority of the owners, such provision is a protection against the injudicious action of a minority owner and is not essential to its validity; in fact, the Supreme Court of Florida in Lainhart v. Catts, 73 Fla. 735, 75 South. 47, and in other cases, has time and again held that the Legislature may create such taxing districts for public purposes without the consent of any of the landowners.

[4] Taxation, while theoretically requiring the consent of the governed, requires that consent through its duly accredited representatives in the legislative departments only, and not the individual consent of each and every property owner to each and every particular item of taxation. Such a requirement would destroy government by preventing the levy and collection of necessary taxes. It may be added that the provision requiring the consent of the owners serves to show that the act is not for a public purpose.

In the first place, the petition for incorporation of the district is made to a court, presumably for the purpose of obtaining from that court an exercise of its judgment as to the necessity for the so-called improvement, and yet such court has no discretion in the matter unless the property owners permit, and cannot incorporate the district, even though it be found that it is for the public welfare, without the written consent of every property owner; thereby providing for the nullification of the power of the court to enter the judgment sought.

[5] Again, the provision in section 8 that in making up the plan for clearing and stumping of lands after such lands should have been included in a district with the consent of all the property owners, such lands shall not be surveyed or estimated without another written consent of the landowner, thereby making it further the useless inclu-

sion of lands in the district when there would be not only no benefit, but also no investigation as to the necessity for benefits. The provision for pulling the stumps does not seem to require the written consent, but it cannot be contended that stumps could be pulled and carried off and become the property of the district without the consent of the property owners and an entrance made upon their lands at large for the purpose of removing the stumps without any right of eminent domain, and without the consent of the property owners, when even the lands could not be surveyed without their consent; the implication being that the consent to the incorporation of the district did not act as a waiver of the rights of control which each property owner exercises over his own land. And again, it is common knowledge that the lands included in this clearing district are what are commonly called "pine lands," or "cut-over pine lands," and that the pine stumps on such lands are valuable for several purposes; and yet under the act the stumps on the land of the owner are pulled up at his expense and freely given to the district authorities. The owner's consent is not requisite. We do not have to rely upon the common knowledge referred to, for the bill and the act show that the stumps are pine, and the clearing district is freely authorized to use them and in processes and retorts derive valuable products therefrom. It is rather a far-fetched argument of the defendants' counsel when they contend that the stumps on the cut-over lands may become receptacles for stagnant water and therefore a breeding place for mosquitoes. In the first place, the act does not purport to be for public health purposes; but, even if it did, the primary and controlling purpose is otherwise. Again, anybody familiar with the stumps of the yellow pine trees knows that they are as nearly everlasting as wood can be; that after the sap together with the bark has decayed there remains nothing but what is called "fat lightwood," and this is full of turpentine, oil of pine, and resin, commonly named "rosin," which is a residue remaining from the distillation of the turpentine. It is common knowledge that where yellow pine forests have been cut and cleared 75 to 100 years or longer, stumps as a rule are sound and furnish no sort of mosquito hatchery.

Surely there should be some protection of the rights of the owner of the land and the natural things thereon—trees and stumps. If there is no limit of the right of government to take without just compensation, to what extent may legislation go in depriving the citizen of his property? What becomes of the doctrine that private property cannot be taken without just compensation? What becomes of the equal protection of the law? We must not stretch the doctrine of parens patriæ or apply the unsound philosophy of Marx, if his teachings or disordered dreams can be dignified as philosophy. Have the people of Florida ever consented to have their private property taken for private use or for a fictitious public use without just compensation? I think not. I also think that while the Legislature had the power to provide for drainage districts and canals in that connection for public health and like public purposes, I do not believe that this clearing and stumping district act can stand the constitutional test.

A comparison of the drainage act with the act here under consideration shows that the latter is merely an attempted adaptation of the former, but in addition thereto confers rights and privileges which are in conflict with those provisions of the federal and state Constitutions which have been referred to. I regret that the Supreme Court of Florida has not passed upon the constitutionality of this act. It is also regretted that the Supreme Court of Alabama has not passed upon the act of that state which seems to be almost a literal copy of the Florida act. If either one of these courts had considered this act, no doubt is entertained that the views expressed as to its unconstitutionality would not be necessary.

Again, the act provides nowhere for the allowance of damages to any of the property owners by reason of the clearing and stumping, and if perchance any damage is done to any fields already cultivated, or to any other parts of the land which were not being cleared or stumped, the property owner had no recourse; there being no provision in the act either whereby the district could be sued.

The successful operation of the legislation depends upon the will of the individual property owners. How may the "plan of stumping and land clearing" adopted be effectively pursued without the consent of the landowners?

It is submitted that even though the circuit court should decree that the establishment of the stump and land clearing district would be in the interest of public health, convenience, or welfare; even though the establishment of consolidation of the district be with the written approval or consent of the owner or owners of all the acreage of the lands within the district; even though the surveys and estimates of the district manager be made upon the written request of the landowners—it is still within the power of the landowners to defeat the operation of the "plan of stumping and land clearing."

There is no provision in the act for the exercise of the right of eminent domain, and it is therefore possible for the landowners to refuse to the officers and employees of the district ingress and egress and thus to prevent the removal of even one stump from the lands within the district. Consent to the formation of the district and to the making of the surveys and estimates does not mean consent to the exercise of the right of ingress and egress or to the removal of the stumps. The accomplishment of the purposes of the act is dependent, therefore, upon the whim and will of the landowners. It is evident from the provisions of the act itself that the consent of the landowners to the establishment of the district and the making of the surveys and estimates in no way implies consent to the subsequent proceedings contemplated; for, after the filing of the report of the commissioners appointed to appraise the lands within the district and to assess benefits and damages accruing to all lands in the district by reason of the execution of "the plan of stumping and land clearing," notice of the filing of such report and for, an opportunity to the landowners to file exceptions thereto is provided for.

Suppose then that the landowners, or a majority of them, or a minority of them, refuse to the officers and employees of the district

291 F.—15

access to the lands; the district—a purported public corporation alleged to have been organized for the promotion of a public purpose—is powerless.

[6] Of course, assuming the legislation to be for a public purpose, the interest of the public in the lands upon which the improvements are to be made can be taken against the will of the owner by proceedings in eminent domain, and the owner of the realty cannot prevent the use thereof, and the public is not dependent on securing his consent to such use. Page and Jones on Taxation by Assessment, § 393.

If there is no way provided for by law by which the use of land on which the improvement is to be made can be taken by eminent domain, it is evident that the public and the other owners of lands are at the mercy of the owner of the property upon which the improvement is to be made. No use of it can be had unless his consent is in some way obtained; and in contemplation of the law the owners of other lands receive no benefits from such improvement, and accordingly local assessments cannot be levied therefor. Page and Jones on Taxation by Assessment, § 400.

This principle has been applied in numerous cases to the location of sewers and drains. People v. Board of Supervisors, 26 Mich. 22; In the Matter of Petition of Cheesebrough to Vacate Assessment, 78 N. Y. 232; People v. Haines, 49 N. Y. 587; In the Matter of Petition to Vacate Assessment, 61 How. Prac. (N. Y.) 315; Olmsted v. Dennis, 77 N. Y. 378; In the Matter of Petition of Rhinelander. to Vacate Assessment, 68 N. Y. 105.

If a drain is to be located on private land and there is no method provided under the law for acquiring an interest in such land by proceedings in eminent domain, no assessment can be levied for such an improvement.

A revocable license from the owner of the land, permitting the public to make temporary use of such drain, is insufficient to make the assessment therefor valid. Page and Jones on Taxation by Assessment, § 403.

In stating the principle I can do so no better than to quote from the Topeka Case, as it was done in Fallbrook Irrigation District v. Bradley, 164 U. S. 112, 17 Sup. Ct. 56, 41 L. Ed. 369:

A private company or corporation without the power to acquire the land in invitum would be of no real benefit, and at any rate the cost of the undertaking would be so greatly enhanced by the knowledge that the land must be acquired by purchase, that it would be practically impossible to build the works or obtain the water. Individual enterprise would be equally ineffectual; no one owner would find it possible to construct and maintain waterworks and canals any better than private corporation or companies, and unless they had the power of eminent domain they could accomplish nothing. If that power could be conferred upon them it could only be upon the ground that the property they took was to be taken for a public purpose.

[7-9] Attention must be given, in connection with the constitutional provisions pointed out, to the following facts: That upon the filing of the petition for incorporation of the district, the notice is given, "To all persons interested"; but by section 3 persons who might resist the incorporation of the district are "any owner of lands in said proposed district who may not have signed said petition." Again, up-

on the filing of the commissioners' report assessing so-called benefits, another notice is published, and again by section 15 "any owner of land or other property to be affected by said report may file exception." And by section 35 of the act the word "owner" is defined as meaning "the owner of the freehold estate, as appears by the deed record, and it shall not include * * * mortgagees, who shall not be counted and need not be notified by publication, or served by process." In other words, the property owners themselves can agree to incorporate their lands in the district by going through with a farce in the court, consent to the assessment of benefits and the levy of taxes, and the holders of mortgages upon the properties involved or any reversioners, remaindermen, etc., are absolutely deprived of any hearing before any court upon any issues whatsoever, even though that taxation amount to a complete confiscation of the property involved and there is rescinded by reason of the fact that the taxes which are levied by the district are made a prior lien to every claim against the lands except liens for state and county taxes. This is a deprivation of due process of law.

It is also an impairment of the obligation of the contract which was made by the Walkill Stock Farms Company with the plaintiff herein, whereby there was an attempt made to give the plaintiff a first lien upon the premises, subject only to the state and county taxes. The only other obligation which the mortgagee was compelled to take into consideration was such burdens as might be imposed by the state for necessary public improvements as same might be recognized by established laws and customs.

It is pertinent to further consider the fact that there is no precedent for such a district in history, and certainly this mortgagee could not have had in mind or in contemplation, either theoretically or actually, the possibility of having a tax levied upon this property prior to his mortgage for the purpose of carrying on a work which by its nature, by custom, by history, and as a matter of universal experience, has been a private function.

The bill goes further and alleges in effect that the Walkill Stock Farms Company, under the new name of the Walkill Stump & Land Clearing District, gave this second mortgage to the defendants in which it bound itself to the work of clearing, etc., which work it was obligated to do under the plaintiff's mortgage. This expedient to fasten on the land a lien superior to that of the plaintiff will not be allowed, for it would be in derogation of the plaintiff's prior rights.

It is also worth while here to consider the discussion in the case of Fallbrook Irrigation District v. Bradley, 164 U. S. 112, 17 Sup. Ct. 56, 41 L. Ed. 369, and the case of Billings Sugar Co. v. Fish, 40 Mont. 256, 106 Pac. 565, 26 L. R. A. (N. S.) 973, 20 Ann. Cas. 264, on the point that what is a public purpose is a matter to be decided by the courts based upon the conditions, customs, and usages prevailing in each state, generally speaking, that what would be a public purpose in one state might not be in another. In fact, this might be illustrated by certain districts that were given the power of eminent domain in connection with mining—tramroads in Nevada, and other moun-

tain states, where such tramroads were available to all of the miners in the neighborhood. This would be ridiculous in states where there was no mining carried on at all, and as is stated in the Montana case, there might be irrigation districts in some other states where it would be ridiculous in other states where there was no necessity for irrigation.

This point has been discussed elaborately in the case of Loan Association v. Topeka, supra, where the language is that—

And in deciding whether, in the given case, the object for which the taxes are assessed falls upon the one side or the other of this line, they must be governed mainly by the course and usage of the government, the objects for which taxes have been customarily and by long course of legislation levied, what objects or purposes have been considered necessary to the support and for the proper use of the government, whether state or municipal. Whatever lawfully pertains to this and is sanctioned by time and the acquiescence of the public may well be held to belong to the public use, and proper for the maintenance of good government, though this may not be the only criterion of rightful taxation.

And in the case of Fallbrook Irrigation District v. Bradley, supra:

We do not assume that these various statements, constitutional and legislative, together with the decisions of the state court, are conclusive and binding upon this court upon the question as to what is due process of law, and, as incident thereto, what is a public use. As here presented these are questions which also arise under the Federal Constitution, and we must decide them in accordance with our views of constitutional law.

It is obvious, however, that what is a public use frequently and largely depends upon the facts and circumstances surrounding the particular subject-matter in regard to which the character of the use is questioned.

And so instances might be multiplied. The Florida Supreme Court has held that drainage in the state is a public purpose even though it be only for the reclamation of lands to make them available for cultivation and settlement. They have implied that irrigation would also be a public purpose. They have held road districts, street improvement, sidewalks, inlet districts, and others as being for a public purpose, all of them being customary in this section of the country, all of them being of general benefit.

But this court does not believe that there is any basis upon which the Florida Supreme Court would make a decision holding that the pulling of stumps or the clearing of land is a public purpose any more than that plowing is a public purpose. The only advantage that can come from the stumping and clearing of lands which is capable of direct appreciation is the fact that it enhances the convenience of the owner. There is much land in Florida that is cultivated before the stumps are pulled out. There are numerous places in the state where crops are grown without clearing entirely, and where clearing would be detrimental to the growers instead of beneficial. How can it be said that the mere increase of convenience to the landowner in the event he is going to raise crops which required the land to be wholly cleared was a public purpose any more than the plowing of that same land would increase his convenience or enhance the value?

The application of section 7, art. 9, of the Florida Constitution, is apparent from the foregoing discussion, namely, that even if the stat-

ute had declared that this was a public purpose, and even if the court had found the same in its decree incorporating the district, still it would have been manifest from an examination of the act itself that under no conceivable circumstances could it be a public purpose, and therefore that if the corporation is a valid corporation at all, it is a private corporation, and the attempt to vest it with the power of taxation is a violation of that section of the state Constitution. However, it cannot either as a public or private corporation be allowed to deprive the plaintiff of its prior mortgage lien.

Attention is directed to the fact that in the decree of incorporation, the court did not find that the incorporation of the lands within this district would be for the public health, convenience, or welfare, but, on the contrary, merely found that such incorporation would be for the advantage of the owners of the real property. If the act be construed, so as to justify the incorporation of a district, in the disjunctive, then it is invalid, for the advantage of the owner is in no sense sufficient to justify the levy of a tax. Every improvement made upon a piece of property, a coat of paint upon a house, roof repaired, all are for the benefit of the owners of the real property, but certainly are anything but public purposes which justify the levy of taxes.

In my opinion, if the act be read in the conjunctive, the word "or" to be treated as meaning "and," then the decree of the court does not conform to the statute, and not finding that the district is for the public health, convenience, or welfare as required by section 3, the incorporation of the district is void, and all actions taken thereunder, including the levy of the tax and the issuance of the bonds, are also void.

The bill attacks the validity of the acts of the board of supervisors in letting contract and in contracting with other corporations of which they were officers, in violation of the statutes of the state of Florida, and charges that the holders of the bonds had notice of these facts. These matters were not involved in the argument and no direct question is made by the motion to dismiss upon these points.

[10] So far as laches is concerned, it should be noted that there has been no default in taxes by the property owners, whereby plaintiff's rights would have been involved, until 1921 taxes became in default in April, 1922. Nor had there been any default in the terms of the mortgage which plaintiff held, which would justify it in considering the validity of its security involved until February, 1922. Under these circumstances this court could not possibly charge the plaintiff with laches in the short time which intervened between the happening of these conditions and the institution of this suit. The fact that the plaintiff did not institute a suit immediately to set aside the proceedings for the incorporation of the district is in no sense an estoppel against the plaintiff, nor does it subject it to the application of the doctrine of laches. If the entire act is unconstitutional or the decree incorporating the district is void, the plaintiff herein was under no duty even at this time to bring this bill, and the fact that plaintiff has been compelled to amend its bill so as to charge that the acts of the attempted incorporation of the district have rendered the securi-

ty of the plaintiff insufficient is complete demonstration that this bill could not have been maintained previously, so long as the Walkill Stock Farms Company had adequate assets and funds with which to pay its taxes and to meet its accruing interest upon the bonds issued under the mortgage and meet its other obligations as they respectively became due, and carried on its business generally. So far as the plaintiff being estopped by reason of the proceedings in the courts, it must be true that no estoppel can arise under an unconstitutional or void act, and under the act itself the mortgagee has never had any opportunity to appear in court and resist either the incorporation of the district or the assessment of benefits, nor was it entitled to participate in the election of the board of supervisors, nor was it even able to enjoin the levy of the tax, as stated above, until the financial condition of the owner of the property became such that its security was impaired. Moreover, if the act creating the stumping and clearing district is void as being in excess of the legislative power, as I think it is, then assuredly the defendants have acquired no right from the enactment, a nullity ab initio. For it is axiomatic that nothing can come from nothing.

The other phase in the bill as amended is that the gross proportion of bonds issued for clearing against the lands in the district, the assessed taxable value amounting to about $50,000 for all the lands of the Walkill Stock Farms Company, whereas there were $300,000 of bonds issued against only $800,000 of land. The matter of six for one exclusive of interest, which by the terms of the act were required to be added to the tax levied for the payment of the bonds, would amount to approximately $300,000 more. In the case of Paul Bros. v. Long Branch Road & Bridge District, 83 Fla. 706, 92 South. 687, the Florida Supreme Court held that where the taxable values were shown to be approximately $300,000 and a bond issue of $1,000,000 was proposed to be issued against them for road purposes, it was apparent that the taxation necessary to pay the bonds would result in the unnecessary taking of complainants' lands in violation of the federal and state Constitutions; and in the instant case the condition is more intolerable, as here there is a proportion of six to one, instead of three to one, as between the bond issue and the taxable values, and with the lands still uncleared, necessitating an additional issue, if the same proportion is to be used, of nearly $200,000 more. This would not be equal protection of the law or due process. It would be to take the property or the property rights of the plaintiff herein and give the same under the guise of a legislative enactment to the defendants—it would be confiscation.

The bill discloses that the act is an impairment of the plaintiff's contract and a taking of its property rights without due process; and, also, that the act was prepared and passed for the purpose of enabling such wrongs to be done. For all of the circumstances alleged in the bill show that the individuals named who were the moving spirits in both the corporations were one and the same, and that they deliberately attempted to place a lien ahead of the mortgage of the plaintiff which would be in their own favor, or in favor of the new corpora-

tion, from which they obtained new money from the sale of its bonds. It is not denied that the act was passed at their instance for that purpose.

I think it is not too much to say that if Dollings and his associates or the Walkill Stump & Land Clearing District were allowed to destroy the plaintiff's mortgage or impair the security upon which the plaintiff's money was obtained, under the scheme afforded by the challenged act, thereby getting other money probably equal to the value of the already pledged property, then the dreams and plans of a "Get Rich Quick Wallingford" would be realized. But the court must not approve their conduct, although, as I think, they imposed upon the credulity of the Legislature which passed this unconstitutional act. It must not be forgotten that the plaintiff's mortgage was made and recorded before the incorporation of the Walkill Stump & Land Clearing District and even before the passage of the act, and those who acquired the bonds of such district were in law compelled to know of the plaintiff's prior mortgage and superior lien.

For the reasons given the act cannot stand; the plaintiff's right acquired under the mortgage executed and recorded anterior to the act is a contract which cannot be impaired as has been attempted; and the plaintiff cannot be denied due process and equal protection of the law.

It follows that decree will be entered overruling the motion to dismiss the bill and requiring the defendants to answer as they may be advised.